Mr. Levine, are you going to split your time, or is just one party going to talk? Well, I will let you two decide when you want to step down and have Mr. Manski step up. Are you going to speak first? Yes. Okay. Thank you. You may proceed. Thank you, Judge. May it please the Court of Counsel? Your Honors, we are here today to appeal the ruling of Judge Hoffman from Lake County, where he issued a summary judgment against our clients, the plaintiff, the Pelliance. This concerns a water system that's in the village, and it's in a particular subdivision that's called Hawthorne Woods Glenshire, which is kind of a mouthful, so I may just refer to it as HWG. It serves about 224 homes, has about 672 customers, and it was originally part of a private, half-private, half-village-owned water system. And there are three particular contracts that apply to and are relevant to this particular water system. There was a 1973 agreement where part of the privately held water system was transferred to Lake County. There was a 1975 agreement in which the village transferred its portion of the HWG water system to the county, and the county accepted it pursuant to a state statute. And then there was a 2009 agreement entitled Water Supply and Sales Agreement that involved not only the village and the county, but also the current water provider, ACWA. What's important in this is initially that in 1973, when the privately held water system was transferred, that became part of the Lake County water system. In the 1975 agreement, and this is something that we highlight in our brief as well, that it was an agreement that completely divested the village of any and all authority out for the remaining portion of the water system and gave it to Lake County. Again, that was pursuant to a state statute. There is nothing in the agreement from 1975, and this is relevant to the Intergovernmental Cooperation Act, that has anything to do with a transfer of governmental authority, the purposes, the powers, the rights, the objectives, or the responsibilities of the contracting parties, being the village and the county of Lake, as far as any transfer of governmental authority from the village to the county. And why is that important? That's important because the Intergovernmental Cooperation Act, which is, again, another mouthful, and if I could just call it the Act, the Act provides, and I quote, that any contract under the Act shall, quote, set forth fully the purposes, powers, rights, objectives, and responsibilities of the contracting parties. So, if you're going to have a transfer of any governmental authority from one body to the next, to another, all those things must be set forth fully, not impliedly, not obtusely, but specifically and fully in whatever contract or agreement you have. Frequently, these will be called, known as the Intergovernmental Cooperation Act, and it certainly was not that. It didn't provide for any transfer of any authority. All it did was a transfer of that portion of the village's water system to the county. And at that point, the village had nothing to do with the county water system located within the HWG subdivision, other than it allowed for, and this is typical of any franchise agreement that a village might have, that the village would not have any competing water system, and that the county could use the village's rights away. And that is typical of any agreement that a village might have, say, with ComEd, NICOR. It was nothing different. There was no authority left within the village to exercise any control for maintenance, repair, or anything else as far as the system goes. The village never agreed to assist in any way? Those were the... No, it had no... No, it had no... I'm not talking about operation of law. Contractually, did the village ever agree to assist? Justice, I'm not sure what you mean by assist. Assist in the upgrade, assist in the turnover, assist in the maintenance, assist in anything. No, not to assist in anything, because that was... There's a specific state statute on it that allows a local unit of local government to transfer authority for water system over to a county and under the county's code. And that's exactly what happens from that point on. You said that's exactly what happened? That's exactly what happened, Justice. Well, if they transferred it over, why wouldn't they transfer over all their rights and volumes, privileges, and duties as well? Why would they keep some aspect of the bundle of rights and responsibilities and emasculate or undermine or subvert, diminish the ability of the successor and interest's ability to properly fund and maintain the system? Well, the successor, the county of Lake, had its own authorities that were provided under state statute for the operation, upgrade, maintenance, repair of a waterworks system. And that is set out by state statute as far as specifically the revenue bonds go under 55 ILCS 5-5-15-017. So all those authorities were already given and provided for by the legislature to the county. The village did not need to do anything as far as giving those rights. And if they were going to, Justice, give any more of their bundle of rights, and I suggested to the court that at that point in 1975, the village did give, to use our law school analogy, all their bundle of sticks over to the county. They didn't retain any bundle of sticks. It would be the same as if I sold my house to my co-counsel, Mr. Manski. I couldn't 35 years later then give an easement over that same property that I sold to Mr. Manski to my neighbor. You're saying that having transferred everything over, they couldn't impose the 2005 or the 2009 contract? Is that what you're saying? That's exactly what I'm saying, Justice. Because in 2009, just like with my example with Mr. Manski, once I had no interest in a property, once I had no interest in the waterworks being the village in this case, I had nothing left in my bundle of sticks to transfer over. And the mere fact that at one point I had an interest, and this is crucial, in only one half, that's where, in my brief, we point out that in our motion for summary judgment response, that the village only owned at best approximately half of this water system to begin with. So even if the county was correct, which they are not, that somehow the village still had some of its bundle of sticks to hand over, in this case the bundle of sticks to the other half. The other half was privately owned, Your Honor, by a land trust which had developed part of the HWG subdivision, and that was the subject, Your Honor, of the 1973 agreement. So there were two agreements that eventually transferred the entire water system, one from a private entity, a land trust, to the county in 1973, and then the second in 1975 from the village for their portion, and they never owned the whole thing, to Lake County, but now Lake County is seeking to impose what essentially is an SSA, a special service area, on this particular water system for which the, ostensibly using the village's authority, although the village never had authority over half of it to begin with. What does the coliform issue have to do with this? Anything? What is the which issue? The coliform, the contamination of the water, have to do with your argument? With this, it really doesn't go to the issue, Your Honor, of whether the county or the village had the authority at the times that they say they did to transfer authority between the village and county pursuant to the act. If it's your position that the village, after entering the contract in 1975, was stripped of any authority whatsoever to enter into the 2009 contract, how is it then that the county had to obtain a permit from the village in order to construct the new system? Well, that's very, Justice, that is very typical of any franchise agreement. If NICOR, for instance, in the city of Wheaton, NICOR has a franchise, if NICOR wanted to upgrade their system to install new gas mains, they get a permit because the village is the permitting authority. It had nothing to do with the fact that the village was once a part owner, not a whole owner, but a part owner of that water work system. Again, it is no different from any other utility type franchise in that if someone wants to install a new water main, new sewer main, new electric, duct bank, or perhaps even, in my example, a gas main, you get a permit from the permitting authority, which is usually the local government. It does not flow at all, and it is completely separate from whatever was addressed in 1975 and the 2009. The 2009 agreement was really an obvious attempt to try to bootstrap the county's authority where it didn't have any, given the opposition of the local homeowners in the HWG subdivision to having this imposed on themselves. That comes to what is the county's real interest and what is their ability to render what is in essence a local revenue bond refunding, again, very much like an SSA on the subdivision here. In the 1975 contract, I don't believe there was a clause indicating that the village was the water system. It was only turning over the right to maintain and repair. It was also the ownership, Your Honor. It was a complete divestiture of whatever rights, all the rights, that the village had in respect to their portion, again, not the whole thing, but their portion of the water work system to the county pursuant to state statute. The county then took it under its authority by virtue of passing an ordinance, which again was pursuant to the state statute, and they became the sole owner. You believe that in 1975, all the rights, the entire bundle of sticks was transferred from the village to the county? Absolutely. You look at the agreement, there's nothing they retained except which, again, would be a standard. Then explain to me again why there's a problem with the county issuing a bill with a surcharge in it to people who didn't pay up front. Because, Justice, the county does not have the authority to do that. The county only has the authority to issue revenue bonds payable by the entire water work system, repayable by the entire water work system. It does not, because it is a non-home rule unit of government, it does not have the authority to issue a limited geographical area revenue bond. Did the village have the authority to do so? The village does have the authority. I thought you said the village transferred its interest to the county. So you're saying that when they transferred their interest to the county, the county got the interest, but then the county couldn't use those interests because the county was a non-home rule county? That's not what I'm saying. What I'm saying is what the county received from the village was the ownership of the water work system. By taking the ownership of half of the village's water work system, that did not de facto transfer all the villages possible. And remember, Justice, this is 30 years later, over 30 years later that the county is now trying to do this. For the county to be right, they have to say any time that the county takes, or some other units of government, any time the county obtains, which it doesn't provide for in the state statute that addresses this, that when the county takes a water system over from a unit of local government such as the village, that they de facto take with it all the rights that are given to a village in respect to that in perpetuity. There is absolutely no authority, there's no state statute, there's no case that ever holds that a transfer of a water work system, and there is a state statute, also carries with it a transfer of all the authority that a village could ever have for all time. I mean, it's not like in 1975, then the village's rights transferred to the county and the county issued revenue bonds. They did this 34 years later. There is simply no basis in the law that supports this type of transfer. And it's vividly clear that the county does not have this authority on its own when in fact the county does not anywhere provide for a SSA type or a payment of revenue bonds like the municipal code does. The municipal code for revenue bonds for a water work system in 65 ILCS 5-11-139-8 specifically provides that a municipality can do this. Clearly, if the legislature would have intended to give that type of authority and power for very much like an SSA, as the county proposes, that language would have been in here. Didn't the 1975, now let's be clear about one thing. The village isn't a party in this case. No ma'am. Okay. But in 1975. I think the answer means yes, they aren't. They are not a party. The village is not a party, Justice. Because a double O is an affirmative, which means they would be. I will refrain from that in the future, Justice. Okay. So in 1975, the village entered the agreement with the county. And part of that agreement said that the costs of this project would be paid by the consumers. Who are the consumers? They're your clients, correct? Partly, yes. Because as I stated, the village only owned approximately half. I understand that. So yes, that is what it said. That's not what it meant? Well, that's not all it needed to say, Justice. And the act, the Intergovernmental Cooperation Act, is very explicit when it says that any contract, if this was going to be an IGA intergovernmental agreement, of course, which it makes no mention of, in the 1975 agreement or the 2009, it makes no mention of the act. It makes no mention of any authority being transferred. It makes no reference to the authority that the municipality might have under the Illinois Municipal Code to impose a limited geographical area revenue bond. It makes no mention of that. Go ahead. So when the county enters into an agreement with the village, and both of them have the same defect, that the contract should set forth fully the purposes, powers, rights, objectives, and responsibilities of contracting parties, Justice, that is nowhere to be found in the 1975 agreement. That is nowhere to be found in the 2009 agreement. And that's where Judge Hoffman made one of his errors when he said, quote, and this is the transcript of page 64, I think the contract, both of them when read as a whole, impliedly transferred that authority. The act is very specific that you cannot impliedly transfer authority from one unit of government to a second unit of government under the act. Impliedly, it must set forth all these elements, and the act is very clear as to what the Mr. Ransky, do you want to say anything? Yes. Thank you, Justice. I think you're imposing upon him. Good morning, Your Honors. Good morning. I'm going to address two brief issues, the Mormon doctrine issue and the tort immunity issue. This court has previously held that the Mormon doctrine does not prohibit a plaintiff from recovering property damages for a defendant's negligent conduct, and that's the Village Vote Book terrorist case. That's precisely what the plaintiffs have alleged in this particular case, Your Honors. Here in the plaintiff's amended complaint, plaintiffs have alleged that the defendant's negligence in maintaining and operating this system are the very things that approximately cause the plaintiff's property damages. Wasn't there some action taken in 2006 to correct the bacteria issue? Wasn't there a system imposed? After the Illinois EPA required that this system be replaced because of the failure to chlorinate the system, I should say the county did install a temporary chlorination system. However, the Illinois EPA still required that that entire system be replaced. Was it because of the, and you're saying it was because of the negligent operation, but isn't there also an it had to be updated? Well, no, if a proximate cause of our injuries is the fact that they failed to chlorinate the system, then that's all we need under the law. A proximate cause, and that's what we have to do. But they fixed that. They didn't fix it entirely in the sense, Judge, that our property damage claims go back five years. That's the statute of limitations. And your property damage claims amount to what? You had to get bottled water? Our property damage claims involve loss of value to the properties themselves because of the defective system, number one. Number two, the cost to replace the water system, which is now attempted to be borne on these citizens. Number three, temporary cost for bottled water. And number four, the temporary cost to provide filtration systems for their homes. This situation is analogous to a property owner that has a private well. And because a neighboring or adjoining property owner spills contaminated chemicals, toxic chemicals, into the ground, that property owner's well is now contaminated, and he or she must connect it to a safe municipal water supply. In that situation, the plaintiffs are entitled to recover the cost to hook up to that safe municipal water supply. And this situation is no different for the citizens of this Hawthorne Woods Glen Shire neighborhood. Their water has been made unfit as a result of the defendant's negligence. Is this a race of cellulocator claim based upon the idea that the coliform wouldn't have been in the system, but for negligence? Or are you actually going to establish that there was a herd of coliform and the night watchman was looking in the wrong direction when it snuck in? You know, Your Honor, a couple things there. When we don't have arrests, it's a claim. However, that's certainly possible. But what we are talking about here is just purely negligence. They were required by statute, they in the county, they were required by statute to chlorinate the system. They didn't. That failure is what led to this bacterial growth, which ultimately led Illinois EPA to say this system has to be replaced. Your water is unsafe. Well, there were other problems with the system as well. Absolutely. I mean, it was not just this issue. There were the age of the system. It had to be upgraded regardless of whether IEPA stepped in. Well, I don't know if that's necessarily true, Your Honor. Because you can't even, I mean, most of the water systems in our state are old. And what they require is replacement. And typically that's done piecemeal when you're operating and maintaining a water system. You find out that one section of pipe is defective or it's corroding, it gets replaced. Isn't our focus here really on the manner in which the county carried out or failed to carry out its duties in determining whether or not? That's our position, Your Honor, yes. Is that a discretionary or ministerial? No. It's definitely, and this will move us into the tort immunity act, it is not discretionary. And the reason we say and believe that it's not discretionary is because the chlorination of the system was something that was required by statute. Once it's required, that takes it out of the realm of discretionary and makes it ministerial. And even more important is the fact that at this stage, the pleading stage, it's the defendant's burden to establish that discretionary immunity. And they failed to do that here. They have to establish that burden on the face of the complaint itself or by evidentiary materials that support the position. And they didn't either here. What was the calamitous event that took place? Under the case law, once a situation becomes dangerous, calamitous, that takes it out of the realm or an exception to the warning doctrine. In the case law, there's a case, it's Muirfield, it's also a second district of public court decision. It says once that dangerous condition is discovered and made apparent, that's when the event takes place. So in this particular case, once it became apparent, once the Illinois EPA says to these folks, your water system is unfit, you can no longer use it. That is the dangerous, sudden, calamitous event. In Muirfield, it was a situation where mold and bacteria grew over time. And this court found that once the plaintiff's discovered, even though that mold and bacteria grows over time and it's a gradual process, once it's discovered, that's the calamitous, that's the dangerous, that's the sudden event. But the EPA came in in 2006, I think, or 2000 and said, you have a problem here. They fixed it in 2006. So where is the sudden part of this? I'm not going to dispute the calamitous part for purposes of this argument. But where's the sudden part of this problem? It wasn't until, I believe, after 2005 when there was a third exceedance of this total coliform bacteria that Illinois EPA came in and said, this water system needs to be replaced. Well, we're not disputing, at least I didn't think we were, we're not disputing the 2006 fix. That was paid for not by revenue bonds. It was paid for somehow out of the total fund that you're talking about, correct? To be honest, Your Honor, I do not know who exactly paid for it. Mr. Levine might know that. I didn't see it argued. I thought the issue was when it was decided that the system would be replaced is when the assessment for either $22,000 or whatever that figure is was levied upon the consumers of this water. And like I said, Judge, to address this 2006 issue, this was a temporary fix, a temporary chlorination system that was required by Illinois EPA until the system was rebuilt. And under tort law, the plaintiff's statute of limitations goes back and they can recover damages five years before. So in other words, between 2000, 2000 is the first year we know that this total coliform bacteria number was exceeded. Going all the way back to 2000, the plaintiffs have the right to establish their damages claims. I think I've addressed both the tort immunity issues now and the Mormon doctrine issues, so thank you. Mr. Back or Bach? Bach. May it please the court. One of the issues counsel just raised with respect to replacement of the system, he indicated in systems they just, if a pipe breaks or whatever, they replace the pipe. That was the particular problem with this system. The pipes of the system were in people's backyards and front yards and they were one and a half inches and two inches in diameter. About half the size, less than half the size of what the minimum size of a public water system is. They couldn't be replaced in kind. And frankly, the EPA wouldn't- Was it a galvanized iron pipe? Galvanized iron pipe that had been in the ground for 50 years, yes. And the EPA wouldn't let Lake County replace pipe in kind anymore. So the system had to be replaced. It wasn't because the chlorination facilities were temporary. They were temporary. It was a decision, a policy decision made by the county. Because of the type of system it was, to put in a code-compliant chlorination system, they would have had to elevate all of the storage tanks that were below ground. They would have had to elevate the chlorination facilities, which they couldn't have done with the existing system. So they did a temporary chlorination system in 2006 until it was finally resolved on how the system would be replaced. Is that temporary system part of this cost or was that assumed from some other fund? No. This system, through the years, like any other system, when it had pieces of it replaced in kind, that was part of the operating expense of the system. The temporary chlorination facilities were part of the operation of the system. They went in with the regular rates that every rate payer in any of the county systems paid. This particular system, though, as the court was talking with the other counsel about the 1975 contract, the 1975 contract in Section 6 is quite specific because of the nature of the system that was being transferred. It said that whenever this system is expanded and approved, that revenue bonds issued to do that would be paid from funds derived from the operation of this local system. And, frankly, that's all that was updated in the 2009 contract because that had to be done, because although there were terms in this 1975 contract that said that the village wouldn't allow competing systems, which would have been a way if the county system in the village had expanded over time, the system would have had to have been replaced 20 years ago, but they didn't. They allowed a competing system to be built. Mr. Levine said that even though there may be some language in that 1975 contract, that language is not sufficient to let the county just impose the fee on the consumers. Well, I would take issue with that. His reading of the Intergovernmental Cooperation Act is quite overly focused. If you look at the 1975 contract, there's a list of things that the village is supposed to do that the county is supposed to do. Included in those things was the village agreed to give the county the authorization to go and replace the system in the village streets. And, frankly, when it came down to actually doing that in 2009, actually in 2008 when the county applied for a permit to do that, they refused to do it unless the county switched. And instead of the contract for a well house and reservoir site in the subdivision connected with the competing system that they'd allowed, which was part of the reason for the 2009 agreement, so that the village could impose recapture fees on this particular subdivision for connecting into that other competing system, and the village could impose connection fees to that system, which the village was good enough to include back in as part of our construction project cost for building and constructing the brand new system. But once again, the village isn't part of this litigation. It's not a party right here. No, not in this one. There were several others that they were, and several others with contractors and other subdivisions that they... Are you suggesting that based upon the earlier contract that the village was overreaching in the 2009 contract? No. The property was within the village. The village still exercised all the authorities that a village would have over any business operating within the municipal boundaries. And they fully exercised those authorities. When it came time to actually doing something about this 50-plus-year-old system, they in fact required... Well, if the 75 agreement indicated that the county would be allowed to place the pipes in the right way for public property of the village, then how could the village narrow that right or limit that right? Obviously, you have to get a permit to do any sort of construction. And for example, and this would go also to the discretionary ministerial side of the Tort Immunity Act arguments, in building a new water system in an existing subdivision... I mean, this is not putting it in raw ground before any houses are up. All the houses are already there. You have alternatives on how you can put that pipe in. You can do it the cheap way, which would be open cut. And then you'd be cutting through everybody's driveway and having all the associated problems with that. It would be cheaper. Or you can do it another way, which would be through boring, where you simply have some receptor holes where you put the boring machine in and you drill horizontally. Again, a discretionary decision. How are you going to do it? How are you going to pay for it? You look at the circumstances you have right now, where you have all of these houses, 224 residences, and you're going to be working within them while people are living there. County made that discretionary determination. And in fact, they did. Virtually all of the project by boring method of construction. And that's what the village has authority over with respect to giving permits. You're going to be drilling under, you're going to be working in our streets. We don't want you to rip up the streets or cause damage, actual damage, like there was in that Oak Brook Terrace case that was cited by the plaintiffs. But again, that was actual damage. And getting over into the arguments relating to the Mormon doctrine and the Torah Immunity Act. The Mormon doctrine clearly applies in this situation. Just look at that Chicago flood litigation case. That case is right on point. The claims that were allowed, as an exception to the Mormon doctrine, were the ones by the plaintiffs who had claimed lost perishable inventory. Actual specific damages that were alleged. But the ones that just claimed that they were damaged, they couldn't use their basement, they had these other economic losses, the court rejected that. Said those are pure economic losses. And you have the same situation here. Do you have any claim that somebody was injured? You don't. Do you have any claim that any personal property was damaged? You don't. Do you have a claim that, oh, we think our property might be worth a little bit less because we've got a 50-year-old water system in the ground? And they do. They did. Let me ask you a question regarding the water work system. Isn't the definition of the water work system in the county's code just referring to parts that make up the system, for example, meters, pumps, et cetera, instead of referring to the whole system that only serves a part of an area? Well, you know, that definition is intended to be inclusive like that, and if you go back to 15017 in the county's code, you look at that provision, and it's quite clear. When it talks about any water works properties or any sewers properties or combination thereof, it's my understanding that when you're reviewing a statute, you're supposed to interpret it in a manner so that every part of it has meaning. And frankly, if the plaintiff's interpretation was the meaning, you wouldn't need any of those phrases or combination thereof in that statute because it would always be the whole thing. It would always be the whole thing. But not a part. But not a part. And in fact, the legislature made quite clear in dealing with counties, you know, it's not the same as municipalities. Counties can't annex property like municipalities can. Their boundaries aren't moving all the time. You don't have the same sort of thing. They are, aren't they? They are in the sense that once something's next in the municipality, you have less and less. Our boundaries are static. Our boundaries are completely static. The territorial limitations within those exterior boundaries may diminish. Right. The unincorporated area is always getting smaller, or at least it always has been during my lifetime. And the fact of the matter is that the legislature made that part of the general provision in the public works sections of the county scope, where it described it as any water works property because within counties you're going to have systems like the facts in this case show. Well, the county had dozens of water systems located at different areas throughout the county. What's your response to Mr. Levine's argument that the magic words aren't in the contract? I don't think that there is any requirement for magic words. The magic words are that they're nearby. A magician cannot do a trick without saying abracadabra. Well, actually, they can, but part of the show is the abracadabra. The legal effect of the effect is diminished. But, frankly, as is pointed out in the county of Wabash versus Partee case cited in our brief, the court there indicated that the Illinois Constitution, Article 7, Section 10, makes quite clear that local governments are authorized to contract between themselves to share their functions and responsibilities. And, in fact, that was what was done in these contracts because if you look at either the 1975 or the 2009 contracts, there is a listing and a specification of everything that has to be done between these parties. And just picking the 2009 contract in particular, the county agreed to pay recapture fees to connect into this competing system. The county agreed and the village agreed that the $2,000 per house connection fee that the village would impose would be returned over to the county as part of the construction project revenues. The village agreed and the county agreed to release the village from any claims the county might have because of breach of contract because they allowed the competing system in the village in violation of what we would have considered a violation of the terms of the 1975 contract. Each of those rights and responsibilities is quite specifically laid out, including the obligations of the customers of the system to pay for the upgrade of the system in much the same way as Section 6 of the 1975 contract laid it out, only this time it was more specific because we knew exactly what we were going to be doing with a subordinate revenue bond underwritten by the charges, the surcharge to the individual customer. What about tort immunity? With respect to the Tort Immunity Act, Your Honor, I think it's quite clear that in deciding whether or not and when you're going to replace a water system like this, it's a policy decision. Frankly, that's what I think. Maybe I'm wrong, but I got the impression Mr. Manski was saying that the tort that you're not immune from was the negligence that caused or required the new system and not the exercise of discretion indicating that you decided that you want or were going to build a new system. Actually, Your Honor, looking at what they were alleging as the tort, which ties to the random coliform counts that showed up in the testing that was done of the wells in that system, there was a policy decision, as I described before, in how to handle and eliminate that particular notice of violation that had been received, and that was the temporary chlorination facilities for the same reasons I described before. If you put in permanent chlorination facilities, it would have been a monumental construction project as opposed to the one that were the less expensive temporary facilities until the system could be replaced. Well, did the temporary system stop the coliform presence? Yes. There was nothing after they cited 2000 to 2005 time period. Was it an abuse of discretion to take four or five years to put the system in? Having been involved in all of the public meetings, we were involved in all of the forums that were heavily populated with very interested people, and all of the other lawsuits involving the village that were involved. Thank goodness the system's in the ground now. But no, time period and given the other litigation that was involved that's cited in part of the record, there were lawsuits between the county and the village relating to this. I have one. Did the failure to chlorinate actually damage the system? Absolutely not. So why did it have to be replaced? Because the EPA refused to give the county any more permits to replace in kind. The thing is, if you've got one-and-a-half-inch pipes on each side, you can't put a four-inch pipe in the middle. The little water pressure they had with the system that had one-and-a-half to two-inch pipes would have been nothing if you put it in a system like that. So functionally, it wouldn't have worked. So the EPA, yes, they forced our hand by simply refusing to give us permits to replace in kind, which is what had been done for the 30-plus years before. Okay, thank you. Thank you, Your Honor. Your Honors, I just want to address a couple of very quick points. It is undisputed that the failure to chlorinate this system was a proximate cause, a reason why. Well, that brought it to the attention of everybody. But once that attention was brought, the rest of the system is now, you know, laid open. And how can you say that it was the village's or the county's negligence in maintaining that caused it to have to be repaired? Because that is exactly why, that is one of the reasons why Illinois EPA said no more, this system has to be replaced. Because that total coliform count, that bacteria was so high because they were failing to chlorinate. So as long as it's a cause, there can be several other causes. Under tort law, that is enough, whether it's because in addition to the fact that it wasn't chlorinated, the system is old, the pipes were small, those are all additional causes. But we have a cause, one of the causes that required Illinois EPA to shut this system down was the fact that it was not chlorinated and that bacteria got out of control. So I wanted to answer that question for you. Number two, discretion. The discretion, and Your Honor hit right on that point, the discretion that counsel was just talking about was the discretion on how they were going to replace and when and where they were going to put lines. The discretion that we're talking about in our complaint, or I should say the allegations, the occurrence, the issues that are being talked about in our complaint is that failure to chlorinate the water. And there was no discretion. They were required to do that by statute, which takes it again out of the realm of discretionary and into the realm of ministerial. Am I correct in my basic understanding that coliform is basically found in fecal matter? Yes, that's correct. And so if there were coliform presence in the system, it had to be through some sort of contamination in the wells where the coliform seeped into the wells? Or was there some other source of contamination? I don't know, Your Honor. I don't know the exact source of the contamination. Well, if you don't know the source, how can you tell whether someone's negligent is the problem? Well, for a couple of reasons. Number one, that chlorination system is designed specifically to keep these total coliform numbers below a health threat. And that's not what happened here. And in addition, I know that because Illinois EPA came to that conclusion. Illinois EPA said because this system is not being chlorinated, these total coliform numbers, these bacteria are out of control. There's no dispute that the system had to be replaced because of the age of the system? Is there a dispute? I don't know that for certain, Your Honor. I certainly know that defense counsel has argued that. But I do know for certain that one of the reasons it needed to be replaced was because of these total coliform numbers. Let me ask you, counsel mentioned the Chicago flood litigation. Did the Supreme Court hold in the Chicago flood litigation specifically that a municipal corporation acts in a discretionary manner when it selects and adopts a plan to make public improvements? I believe that is true. Yes, it's true. But that, again, is talking about the making of the public improvement once they're being told they need to replace it. The issue that we're talking about is the failure to chlorinate, which was not discretionary. It was required by statute. And that's alleged in the complaint. And remember, that's what we're talking about here. We're at the complaint stage. We're at the allegation stage. Of course, we need to develop all of our proofs.  And to get back, Your Honor, to the Chicago flood litigation, I believe that that case supports plaintiff's claims here. In that particular case and in the Village and Deerfield case, which is another 2nd District case, both courts found that exfoliation of food that occurred as a direct result of an interrupted service utility was compensable in tort. And we're talking about the very same thing here. In those cases, it was food. In this case, we're talking about unfit water. And like the Chicago flood litigation and like the Village and Deerfield case, the product, the consumer good here is water. It's been deemed unfit as a result of something that was done, nitrogen, in the provision of this utility, the water service. And that is compensable in tort. One more thing that I wanted to mention before I step away. There was a couple of questions about after 2006, how are they damaged. And one thing I forgot to point out before is that even after the temporary system was installed in 2006, the plaintiffs are still stuck with the cost of this new system. And that extends well beyond the 2006 date. Thank you. Thank you. We'll take the case under advisement. I'll be assured.